IN THE

# United States Court of Appeals

## FOR THE SIXTH CIRCUIT

◆ ◆

In re: TAGNETICS, INC.,

*Debtor.*

TAGNETICS, INC., aka Powershelf,

*Appellant,*

—v.—

KENNETH W. KAYSER; RONALD E. EARLEY; JONATHAN HAGER,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO (DAYTON),
U.S. BANKRUPTCY COURT (DAYTON)

## BRIEF FOR APPELLANT

STEPHEN B. STERN
KAGAN STERN MARINELLO
   & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(410) 216-7900
stern@kaganstern.com

*Attorneys for Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Tagnetics, Inc., is a nongovernmental corporate body appearing in the United States Court of Appeals for the Sixth Circuit.  Pursuant to Federal Rule of Appellate Procedure 26.1, Tagnetics, Inc., is not subsidiary or affiliate of any publicly owned corporation not named in this appeal.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ........................................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................... ix

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF ISSUES ......................................................................................2

STATEMENT OF THE CASE....................................................................................3

STATEMENT OF FACTS ........................................................................................7

SUMMARY OF THE ARGUMENT ....................................................................17

STANDARD OF REVIEW ....................................................................................19

ARGUMENT ........................................................................................................19

    I.     The District Court (And, Thus, Bankruptcy Court) Erred By Finding
          That The Phrase "Full Mutual Releases (No Carve Outs)" Does Not
          Include Releases Of Related Parties ...................................................19

          A.    The District Court Erred by Finding the Phrase "Full Mutual
                Releases (No Carve Outs)" Clearly and Unambiguously Does
                Not Include Releases of Related Parties ...................................19

                1.    Legal Standard for Interpreting a Written Contract.......19

                2.    The District Court Mischaracterized Tagnetics'
                      Position on Whether the Agreement was Clear
                      and Unambiguous……………………………….....21

                3.    The District Court's Interpretation Results in
                      "Manifest Absurdity" When Considering the
                      Remaining Petitioning Creditors Conceded
                      Affiliates are Subject to the Release…………………..22

ii

4. The District Court Interpreted the Words "Full" and "No Carve Outs" Incorrectly...........................24

5. The District Court Disregarded Numerous Cases that Undercut its Decision and that Support Tagnetics' Position.............................26

B. If "Full Mutual Releases (No Carve Outs)" Does Not Clearly And Unambiguously Include A Release Of Related Parties, The District Court Should Have Found The Phrase Was Ambiguous And, Therefore, It Should Have Considered Extrinsic Evidence, Which Overwhelmingly Supports Tagnetics' Interpretation ............................................... **Error! Bookmark not defined.**4

1. Standard for Determining Ambiguity.....................35

2. The Phrase "Full Mutual Releases (No Carve Outs)" Is Ambiguous.............................................36

3. Extrinsic Evidence Overwhelmingly Favors Finding That "Full Mutual Releases (No Carve Outs)" Includes Releases of Related Parties.....................38

II. Alternatively, If "Full Mutual Releases (No Carve Outs)" Does Not Include A Release Of Related Parties, The District Court Should Have Found That There Was No Meeting Of The Minds And There Is No Valid Settlement Agreement To Enforce ...........................................44

CONCLUSION...........................................................................50

CERTIFICATE OF COMPLIANCE.....................................................51

CERTIFICATE OF SERVICE ..........................................................52

ADDENDUM ..........................................................................53

# TABLE OF AUTHORITIES

**Statutes**

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 158(a)(a) ...................................................................................1

28 U.S.C. § 2107(a) ......................................................................................2

**Federal Cases**

*216 Jamaica Ave., LLC v. S&R Playhouse Realty Co.,*
    540 F3d 433 (6th Cir. 2008) ......................................................45

*Arnoul v. Busch Entm't Corp.*,
    Case No. 8:07-cv-1490-T-24-MAP, 2008 U.S. Dist. LEXIS 104709
    (M.D. Fla. Dec. 19, 2008) .........................................................31

*Baker & Getty Fin. Servs., Inc.,*
    974 F.2d 712 (6th Cir. 1992) ....................................................19

*Banta Props. v. Arch Specialty Ins. Co.*,
    Case No. 10-61485, 2014 U.S. Dist. LEXIS 192154
    (S.D. Fla. June 27, 2014). .........................................................30

*Eagle-Picher Indus., Inc.*,
    999 F.2d 969 (6th Cir. 1993) ....................................................19

*Fletcher v. Honeywell Int'l, Inc.,*
    892 F.3d 217 (6th Cir. 2018). ...................................................37

*Flo-Lizer, Inc.*
    946 F.2d 1237, 1240 (6th Cir. 1991) .......................................19

*Int'l Bhd. of Elec. Workers v. N.L.R.B.,*
    788 F.2d 1412, 1414 (9th Cir. 1986)........................................47

*Lamie v. U.S. Trustee,*
   540 U.S. 526 (2004)........................................................................25

*Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*,
   210 F.3d 672 (6th Cir. 2000) ........................................................20

*Moore v. Menasha Corp.,*
   690 F.3d 444 (6th Cir. 2012). .......................................................37

*NRRM, LLC v. Mepco Fin. Corp.,*
   No. 10 C 4642, 2015 U.S. Dist. LEXIS 39058, 2015 WL 1501897
   (N.D. Ill. Mar. 27, 2015).................................................... 31, 32, 33

*Over & Under Piping Contrs. Inc. v. Vt. Gas Sys.*,
   Case No. 2:15-cv-169, 2019 U.S. Dist. LEXIS 807
   (D. Vt. Jan. 2, 2019) ......................................................... 27, 28, 37

*Perlmuter Printing Co. v. Strome, Inc.*,
   436 F. Supp. 409 (N.D. Ohio 1976)...............................................44

*RE/MAX Int'l, Inc. v. Realty One, Inc.*,
   271 F.3d 633 (6th Cir. 2001) ................................................. 20, 24

*TMW Enters. v. Fed. Ins. Co.*,
   619 F.3d 574 (6th Cir. 2010) ................................................. 25, 27

*Trebilcock v. Elinsky*, 2007 WL 295440, 2007 U.S. Dist. LEXIS 6167
   (N.D. Ohio January 26, 2007) .......................................................26

*Trs. of the Painters, Union Deposit Fund v. G&T Commer. Coatings, Inc.*,
   Civil Action No. 13-CV-13261, 2014 U.S. Dist. LEXIS 129945
   (E.D. Mich. Sept. 17, 2014). ..........................................................46

*United States v. Donovan*,
   348 F.3d 509 (6th Cir. 2003) ................................................. 20, 35

*WesBanco Bank Barnesville v. Rafoth,*
   106 F.3d 1255 (6th Cir. 1997) ............................................... 19, 20

## State Cases

*Advantage Renovations, Inc. v. Maui Sands Resort, Co., LLC,*
2012-Ohio-1866, ¶18 (6th Dist. 2012) ..........................................................48

*Alamo Fin., L.P. v. Mazoff,*
112 So. 3d 626 (Fla. 4th DCA 2013)............................................................30

*Alexander v. Buckeye Pipe Line Co.,*
374 N.E.2d 146 (Ohio 1978)............................................................ 20, 36, 39

*Bank of Am., N.A. v. Seymour,*
2019-Ohio-2884 (10th Dist. 2019)................................................................49

*Beechwood Villa Apartments v. Nord Bitumi U.S., Inc.,*
1990 Ohio App. LEXIS 1561 (12th Dist. 1990) .............................. 47, 48, 49

*Board of Trs. of Fla. Atl. Univ. v. Bowman,*
85 So. 2d 507 (Fla. Ct. App. 2003) ....................................................... 28, 29

*Carey-All Transp., Inc. v. Newby,*
989 So. 2d 1201(Fla. 2d DCA 2008)............................................................30

*Foster Wheeler Enviresp05onse, Inc. v. Franklin County Convention Facilities Auth.,*
678 N.E.2d 519 (Ohio 1997)................................................................. 19, 35

*Geczi v. Lifetime Fitness,*
2012-Ohio-2948, 973 N.E.2d 801 (Ohio Ct. App. 2012)..............................35

*Gotham v. Basement Care, Inc.,*
2019-Ohio-3872 (September 25, 2019)................................................. 25, 27

*Hold v. Manzini,*
736 So. 2d 138 (Fla. 3d DCA 1999)............................................................28

*Inland Refuse Transfer Co. v. Browning-Ferris Indus, of Ohio,*
474 N.E.2d 271 (Ohio 1984).......................................................................20

*Jamaica Ave., LLC v. S&R Playhouse Realty Co.*,
    540 F.3d 433 (6th Cir. 2008) .........................................................45

*Kelly v. Med. Life Ins. Co.*,
    509 N.E.2d 411 (Ohio 1987)..........................................................20

*Kenney v. Chesapeake Appalachia, LLC*,
    2015-Ohio-1278, 31 N.E.3d 136 (Ohio Ct. App. 2015)...............36

*Kostelnik v. Helper*,
    96 Ohio St. 3d 1 (Ohio 2002)................................................ 44, 45

*Ledyard v. Auto Wonders Mut. Ins. Co.*,
    739 N.E.2d 1 (Ohio Ct. App. 2000) ............................................20

*Lutz v. Chesapeake Appalachia, LLC*,
    148 Ohio St. 3d 524, 2016- Ohio 7549, 71 N.E.3d 1010 (Ohio 2016) ........35

*Michele K. Feinzig, P.A. v. Deehl & Carlson, P.A.*,
    176 So. 3d 305 (Fla. Ct. App. 2015) ...........................................29

*Nilavar v. Osborn*,
    711 N.E.2d 726, 127 Ohio App. 3d (Ohio Ct. App. 1998) ...........45

*Obregon v. Rosana Corp.*,
    232 So. 3d 1100 (Fla. 4th DCA 2017)..........................................30

*Oryann, Ltd. v. SL & MB, LLC*,
    2015-Ohio-5461 (Ohio Ct. App. 2015) ........................................37

*PNC Bank, N.A. v. Springboro Med. Arts., Inc.*,
    2015-Ohio-3386 (2d Dist. Ct. Appeal 2015) ...............................23

*Reilley v. Richards*,
    69 Ohio St. 3d 352 (Ohio 1994)...................................................49

*State Farm Mut. Auto. Ins. V. Nichols*,
    932 So. 2d 1067 (Fla. 2006) .........................................................30

*Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*,

140 Ohio St.3d 193, 2014-Ohio-3095 (2014) ...............................................26

*Turoczy Bonding Co. v. Mitchell,*
   2018-Ohio-3173 (Ohio Ct. App. 2018)..........................................................45

*United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.,*
   129 Ohio App. 3d 45, 716 N.E.2d 1201 (Ohio Ct. App. 1998) ...................35

*Washkeweicz v. Seredick,*
   1986 Ohio App. LEXIS 5216 (8th Dist. 1986) ............................................40

*Wilson v. Pride,*
   2019-Ohio-3513 (8th Dist.2019). ................................................................47

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to FRAP 34 and 6 Cir. R. 34(a), Appellant Tagnetics, Inc., requests oral argument, which it contends is likely to significantly aid the Court in rendering its decision in this matter.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction on appeal from the United States District Court for the Southern District of Ohio, Western Division at Dayton (the "District Court") pursuant to 28 U.S.C. § 1291. This appeal stems from a final order of the District Court, wherein the District Court affirmed a decision of the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton (the "Bankruptcy Court") dated October 25, 2019, which granted in part and denied in part a Motion to Enforce Settlement Agreement filed by Appellant Tagnetics, Inc. ("Tagnetics"). Tagnetics appeals the District Court's order that affirmed the Bankruptcy Court's ruling in two respects. First, Tagnetics appeals the District Court's decision (and, thus, the Bankruptcy Court's decision) that the scope of the release agreed to by the parties did not extend to related parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives. Second, in the alternative, if the respective lower courts properly found that the release did not extend to related parties, the lower courts erred by granting Tagnetics' Motion to Enforce Settlement Agreement even in part because there was no meeting of the minds and, as a result, there was no settlement agreement to enforce. Pursuant to Rule 8003(a)(1) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 158(a)(a), the District Court had jurisdiction of the appeal

from the Bankruptcy Court because it was an appeal from a final order of the Bankruptcy Court.

On April 27, 2020, the District Court entered an Entry and Order Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case. On May 26, 2020, Tagnetics noted its appeal in this matter, making the appeal timely pursuant to 28 U.S.C. § 2107(a). On May 29, 2020, this Court issued the briefing schedule for this matter, which set July 8, 2020 as the deadline for Tagnetics' Principal Brief. Thus, according to the briefing schedule issued by this Court, Tagnetics' principal brief is filed timely.

## STATEMENT OF ISSUES

1.     Whether the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, and the United States District Court for the Southern District of Ohio, Western Division at Dayton, erred in finding that the phrase "full mutual releases (no carve outs)" – which was one of the key terms of the settlement agreement reached by Tagnetics and the Remaining Petitioning Creditors – did not include a release of related parties, including parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

2.     If both the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, and the United States District Court for the Southern District of Ohio, Western Division at Dayton, did not err in finding that the

settlement agreement's release language did not include a release of related parties, whether the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton, and the United States District Court for the Southern District of Ohio, Western Division at Dayton, erred in finding that Tagnetics and the Remaining Petitioning Creditors had a meeting of the minds to enter into a settlement agreement.

## STATEMENT OF THE CASE

This is an appeal of an order by the United States District Court for the Southern District of Ohio, Western Division at Dayton ("District Court") affirming the decision of the United States Bankruptcy Court for the Southern District of Ohio, Western Division at Dayton ("Bankruptcy Court"), which granted in part and denied in part the Motion to Enforce Settlement Agreement filed by Tagnetics, Inc. ("Tagnetics"). The Bankruptcy Court found that a settlement agreement entered into by Tagnetics on the one hand, and Kenneth K. Kayser ("Kayser"), Ronald E. Earley ("Earley"), and Jonathan Hager ("Hager") (collectively, the "Remaining Petitioning Creditors") on the other hand, was enforceable, but the phrase "full mutual releases (no carve outs)" did not include a release of individuals/entities related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives (referred to herein collectively at times as "Related Parties").

On or about July 19, 2019, the parties began discussing settlement of this matter in earnest, mostly through exchanging emails. Ultimately, Tagnetics and the Remaining Petitioning Creditors agreed to a settlement, the key terms of which were documented in an email from Tagnetics' counsel at 3:27 p.m. on July 26, 2019. *See* Email from J. Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A13.[1] The email confirming the key terms of the agreement stated the following:

> Ron, Ken, and Jon:
>
> Below sets forth the terms of the agreement we reached by phone. Each of you please reply confirming agreement to these terms and then I need you to initiate a call with the court to advise of the settlement (it makes no sense for any of us to have to show up at court on Monday now that we have an agreement in place that will be documented more thoroughly in a settlement agreement. We can work through the written settlement agreement over the weekend.
>
> Key Terms:
>
> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.
>
> The remaining schedule of payments as you proposed below,[2] except in 12 and 18 months instead of 6 and 12 months.

---

[1] Each of the exhibits referenced in this Brief (other than the transcript of the hearing on October 18, 2019) were admitted into evidence (as confirmed in the hearing transcript, which is part of the Appendix) and identified in the Record Extract filed on November 13, 2019 [Dkt. No. 137].

[2] The schedule of payments below is the schedule of payments that is reflected in the email on July 25, 2019 at 1:25 p.m. Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # 15.

Full mutual releases (no carve outs)

Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment.

I believe that captures the key terms we discussed. Please confirm.

Stephen

*See id.* Hager confirmed the parties' agreement by stating the following in an email: "Mr. Earley is discussing this with the court at this moment. I am responding for Kayser, Earley and Hager saying *we agree to the terms put forth as documented above* [sic]." *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A13 (emphasis added). Two minutes after sending that email, Hager followed up with another email to "clarify that [the Remaining Petitioning Creditors] agree to the terms you set forth in your last email and represented below[,]" and copied the key terms from Tagnetics' counsel's email at 3:27 p.m. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A12.

On August 14, 2019, Tagnetics' counsel sent a draft of the settlement agreement to the Remaining Petitioning Creditors reflecting the terms to which the parties agreed. *See* Email from Stephen Stern to Ken Kayser and Ronald Earley dated August 14, 2019 with attached Settlement Agreement, RE A21, Page ID # A21 - 28. The Remaining Petitioning Creditors, however, incorrectly contended (and still contend) that the settlement agreement, as drafted, omitted a number of terms. Specifically, the Remaining Petitioning Creditors requested a number of carve outs

5

from the release in the settlement agreement. Yet, prior to requesting these carve outs, the Remaining Petitioning Creditors expressly acknowledged that the release applied to Related Parties, including specifically affiliates of Tagnetics. In this regard, the Remaining Petitioning Creditors acknowledged in an email dated August 16, 2019, 2019 that, "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement." *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A30.

Tagnetics responded to the Remaining Petitioning Creditors' mischaracterizations of the settlement agreement, but it was not enough to get the Remaining Petitioning Creditors to sign on to the terms to which they previously agreed. Hence, Tagnetics filed its Motion to Enforce Settlement Agreement.

On October 18, 2019, the Bankruptcy Court held an evidentiary hearing on Tagnetics' Motion to Enforce Settlement Agreement. On October 25, 2019, the Bankruptcy Court rendered its decision that rejected each of the Remaining Petitioning Creditors' arguments seeking other terms and enforced the terms of the settlement agreement with one exception – the Bankruptcy Court held that the use of the phrase "full mutual releases (no carve outs)" did not include "affiliates, parent corporations, officers, directors or other undisclosed third parties" not expressly identified during settlement negotiations. It is from this ruling that Tagnetics files this appeal.

## STATEMENT OF FACTS

The parties commenced settlement discussions in earnest on or about July 19, 2019.  *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A12 - 20.  On July 20, 2019, the Remaining Petitioning Creditors set forth a detailed proposal that included payments to Kayser ($151,582), Earley ($186,980), and Hager ($148,144).  *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A18 - 19.  The Remaining Petitioning Creditors' July 20 proposal also included a number of non-monetary terms, as well as other monetary terms, including, but not limited to:

- A mutual release of all issues arising from [the Remaining Petitioning Creditors'] employment by Tagnetics, [the Remaining Petitioning Creditors'] role as directors of Tagnetics, and [the Remaining Petitioning Creditors'] participation in the petition for involuntary bankruptcy,

- An acknowledgement of Kayser's and Earley's stock ownership, confirmation of number of shares, and unrestricted shareholder's rights,

- Agreement that all provisions of [the Remaining Petitioning Creditors'] contracts, including non-compete, have expired or are cancelled[,]

- Acknowledgment of an outstanding loan from Ron Earley to Tagnetics, principal plus interest to be paid upon sale (to be defined) of Tagnetics,  Principal is $30000 and current balance is approximately $60,000[,]

- Acknowledgment of KVL Core Technology License, $250,000 to be paid upon transfer, sale, or license of Tagnetics' shelf tag technology or the sale of the company, [and]

7

- Acknowledgment of $315,000 of differed [sic] salary to be paid to Kayser upon sale of Tagnetics or other liquidity event.

*See id.* Tagnetics clearly rejected this demand from the Remaining Petitioning Creditors, stating that "the demand [they] put forward [was] not realistic." *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A17 - 18.[3]

After Tagnetics rejected the aforementioned demand from the Remaining Petitioning Creditors, the Remaining Petitioning Creditors then followed up with a new demand later that afternoon, stating only, "Here is our offer after your email this morning. Let us know if there is any interest." *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A17. Notably, the entirety of the remainder of the email consists solely of the following chart:

|  | Ronald E Earley | Kenneth W Kayser | Jon Hager |
|---|---|---|---|
| Initial Payment | $50,000 | $50,000 | $50,000 |
| Second payment 6 mo. | $25,000 | $25,000 | $25,000 |
| Third payment 12 mo. | $25,000 | $25,000 | $25,000 |
| Balance as a note to be paid upon liquidity event | $86,980 | $51,582 | $48,144 |
|  | $186,980 | $151,582 | $148,144 |

[3] Tagnetics' counsel provided a much more detailed explanation in rejecting the Remaining Petitioning Creditors' demand, most of which is not relevant for purposes of this appeal, but Tagnetics' counsel did recommend to the Remaining Petitioning Creditors that they "can and should seek [their] own counsel." *Id.*

*Id.* No other terms or conditions and no reference to an earlier email or previously discussed settlement terms were included in the Remaining Petitioning Creditors' July 23 offer. *See id.* While the Remaining Petitioning Creditors' July 23 offer was not acceptable to Tagnetics, "th[e] structure [was] more in line with what Tagnetics thinks is feasible, but the initial payment [wa]s way too high." *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A15 - 16. Tagnetics made a counteroffer, consistent with the structure of what the Remaining Petitioning Creditors proposed (meaning consistent with the payment schedule), but with a lower initial payment, and the sum by which the initial payment was reduced "would be rolled to the final scheduled payment to each of" the Remaining Petitioning Creditors. *Id.* Again, Tagnetics "encourage[d] each of [the Remaining Petitioning Creditors] to seek [their] own legal advice." *Id.* The Remaining Petitioning Creditors rejected Tagnetics' counteroffer, without making a counteroffer of their own. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A15.

Despite not receiving a counteroffer, Tagnetics invited the Remaining Petitioning Creditors to make one. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A15. A short while later, the Remaining Petitioning Creditors made the following offer:

|  | Ronald E Earley | Kenneth W Kayser | Jon Hager |
| --- | --- | --- | --- |
| Initial Payment | $30,000 | $30,000 | $30,00 |
| Second payment 6 mo. | $30,000 | $30,000 | $30,000 |
| Third payment 12 mo. | $30,000 | $30,000 | $30,000 |
| Balance as a note to be paid upon liquidity event | $96,980 | $61,582 | $58,144 |
|  | $186,980 | $151,582 | $148,144 |

Notably, no other terms or conditions and no reference to any prior email or previously discussed settlement terms were included in this most recent offer from the Remaining Petitioning Creditors. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A14 - 15. And, notably, the total payments to each of the Remaining Petitioning Creditors remained identical to the previous demand made by the Remaining Petitioning Creditors on July 23, 2019 at 1:34 p.m. *Compare* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A17 *with* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A14 - 150.

Tagnetics rejected this July 25 demand, wanting to hear from each of the Remaining Petitioning Creditors as to whether this was the path they wanted to pursue. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, Page ID # A13 - 14. Tagnetics again encouraged the Remaining Petitioning Creditors to "seek advice from bankruptcy counsel." *Id.* Then, throughout the day

on July 26, 2019, Tagnetics' counsel and Earley spoke numerous times over the course of several hours negotiating a potential settlement. Ultimately, Tagnetics and the Remaining Petitioning Creditors agreed on a settlement, the key terms of which were documented in an email from Tagnetics' counsel at 3:27 p.m. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A13. The email confirming the key terms of the agreement stated the following:

> Ron, Ken, and Jon:
>
> Below sets forth the terms of the agreement we reached by phone. Each of you please reply confirming agreement to these terms and then I need you to initiate a call with the court to advise of the settlement (it makes no sense for any of us to have to show up at court on Monday now that we have an agreement in place that will be documented more thoroughly in a settlement agreement. We can work through the written settlement agreement over the weekend.
>
> Key Terms:
>
> Payment of $90,000 total ($30,000 each) within three days of a fully executed agreement.
>
> The remaining schedule of payments as you proposed below,[4] except in 12 and 18 months instead of 6 and 12 months.
>
> Full mutual releases (no carve outs)
>
> Dismissal/withdrawal of claims by each of you to be filed within one day of receiving payment.
>
> I believe that captures the key terms we discussed. Please confirm.

---

[4] The schedule of payments below is the schedule of payments that is reflected in the email on July 25, 2019 at 1:25 p.m. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A14 - 15.

Stephen

*See id.* Hager confirmed the parties' agreement by stating the following in an email: "Mr. Earley is discussing this with the court at this moment. I am responding for Kayser, Earley and Hager saying we agree to the terms put forth as documented above [sic]." *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A13. Two minutes after sending that email, Hager followed up with another email to "clarify that [the Remaining Petitioning Creditors] agree to the terms you set forth in your last email and represented below" and then copied the key terms from Tagnetics' counsel's email at 3:27 p.m. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A12 - 13. Then, further confirming the payment terms the parties had reached, Hager sent yet another email at 4:35 p.m. that same day "confirming the following payment schedule and amount as part of this agreement[,]" which included the following chart:

| | Timing | Ronald E. Early | Kenneth W Kayser | Jonathan Hager |
|---|---|---|---|---|
| Initial Payment | | $30,000 | $30,000 | $30,000 |
| 2nd Payment | 12mos from initial payment | $30,000 | $30,000 | $30,000 |
| 3rd Payment | 18mos from initial payment | $30,000 | $30,000 | $30,000 |
| Balance as a note | Paid upon the next liquidity event | $96,980 | $61,582 | $58,144 |
| TOTAL Settlement | | $186,980 | $151,582 | $148,144 |

*See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A12.  Notably, *no other terms or conditions and no reference to any prior email or previously discussed terms were included in any of the emails from the Remaining Petitioning Creditors* confirming the key terms of the agreement, and the payment schedule in the last email from the Remaining Petitioning Creditors is exactly as described by Tagnetics' counsel in his email at 3:27 p.m. that same day.

Tagnetics' counsel sent a draft of the settlement agreement to the Remaining Petitioning Creditors on August 14, 2019 reflecting the terms to which the parties agreed.  *See* Email from Stephen Stern to Ken Kayser and Ronald Earley dated August 14, 2019 with attached Settlement Agreement, RE A21, Page ID # A21 - 28. The Remaining Petitioning Creditors, however, incorrectly contended (and still contend) that the settlement agreement, as drafted, omitted a number of terms.  By way of example, the Remaining Petitioning Creditors requested a number of carve outs from the release in the settlement agreement.  *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A29.

Prior to seeking these carve outs, however, the Remaining Petitioning Creditors conceded that the scope of the release did apply to Related Parties, such as affiliates.  *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A30.    In this regard, in an email dated August 16, 2019, the Remaining Petitioning Creditors stated that, "[i]f Compass [Marketing] is not an

operating affiliate [sic] then they are not party to this settlement." *See Id*.[5] Stated differently, the Remaining Petitioning Creditors acknowledged that, if Compass Marketing was an affiliate of Tagnetics, it would be included among the parties released by the settlement agreement. This concession demonstrates in no uncertain terms that the Remaining Petitioning Creditors understood the term "full mutual releases (no carve outs)" to mean that parties related to Tagnetics – including specifically affiliates – were subject to and included in the releases.

When the parties were unable to work out the details of the written settlement agreement, Tagnetics filed a Motion to Enforce Settlement Agreement.[6] On October 18, 2019, the Bankruptcy Court held an evidentiary hearing on Tagnetics' Motion to Enforce Settlement Agreement. At that hearing, Tagnetics' counsel testified that he could not recall a single instance in his over twenty (20) year career where a

---

[5] The issue of whether Compass Marketing is an affiliate of Tagnetics is not before this Court, as Tagnetics did not make that an issue on appeal to the District Court.

[6] Tagnetics' Motion to Enforce the Settlement Agreement focused on the Remaining Petitioning Creditors' attempts to impose new and additional settlement terms in between the time the parties agreed to settle on July 26, 2019 and the time it took for the draft settlement agreement to be produced. For example, the Remaining Petitioning Creditors sought additional payments, an accelerated schedule of payments, and a default judgment mechanism, none of which were contained in the July 26, 2019 email. While the Motion to Enforce the Settlement Agreement addressed a number of Remaining Petitioning Creditors' mischaracterizations of the negotiation and the meaning of the July 26, 2019 email, the issue remaining on appeal is whether the scope of the release included not only Tagnetics, but the Related Parties.

settlement involving a business entity did not include a release of related individuals/entities, such as parent companies, subsidiaries, affiliates, officers, directors, and others. *See* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # 197 - 98. Indeed, including such related individuals/entities in a release is "standard operating procedure" and "typical in agreements." *Id.* Tagnetics' counsel's unrebutted testimony was further supported by the fact that a prior settlement in this case was signed by Kayser on behalf of Kayser Ventures, Ltd. ("Kayser Ventures"), and it included the very language at issue here. *Compare* Email from Stephen Stern to Ken Kayser and Ronald Earley dated August 14, 2019 with attached Settlement Agreement, RE A21, Page ID # A23 - 25 *with* Settlement and Mutual General Release Agreement, fully executed on July 17, 2019, RE A31, Page ID # A32. Moreover, the release offered by Tagnetics to the Remaining Petitioning Creditors was equally broad as the one sought by Tagnetics, and the Remaining Petitioning Creditors did not object to the scope of that release (and, in fact, they insisted on full releases). *See* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A186 – 187; A226 - 227.

On October 25, 2019, the Bankruptcy Court rendered its decision enforcing the terms of the settlement agreement with one exception – it held the phrase "full mutual releases (no carve outs)" did not include a release of individuals/entities related to the parties, such as "affiliates, parent corporations, officers, directors or

other undisclosed third parties" not expressly identified during settlement negotiations. On October 30, 2019, Tagnetics noted an appeal to the District Court. *See* Tagnetics' Notice of Appeal, dated October 30, 2019, RE A408, Page ID # A408 - 13.

On February 27, 2020, Tagnetics filed its principal brief in the District Court. *See* Appellants' Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, Case No. 3:19-cv-363, dated February 27, 2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A414 - 675.[7] On April 27, 2020, the District Court entered an Order Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case. On May 26, 2020, Tagnetics filed its Notice of Appeal to the United States Court of Appeals for the Sixth Circuit. *See* Tagnetics, Inc.'s Notice of Appeal, dated May 26, 2020 (Case No. 3:19-cv-363), RE A752, Page ID # 752 - 53.

---

[7] Tagnetics included both its Brief to the United States District Court for the Southern District of Ohio and all of the exhibits referenced in the Brief. Likewise, Tagnetics included in the Record Extract its Motion to Enforce Settlement Agreement, along with the referenced exhibits contained therein. The purpose of including the exhibits was not to be duplicative to other exhibits in the Record Extract, but to otherwise include a complete copy of the briefs submitted to the respective courts. Tagnetics' citations to the record in this matter are to the exhibits that were admitted at the Bankruptcy Court's hearing on October 18, 2019.

# SUMMARY OF THE ARGUMENT

The District Court erred as a matter of law in affirming the Bankruptcy Court when it found that, while Tagnetics and the Remaining Petitioning Creditors had entered into a valid and enforceable settlement agreement, the scope of the releases afforded to and by Tagnetics did not include the release of individuals/entities that are related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

First, the District Court erred by concluding that the phrase "full mutual releases (no carve outs)" clearly and unambiguously does not include Related Parties. In reaching its conclusion, the District Court disregarded that the fact that the parties all understood the phrase "full mutual releases (no carve outs)" to mean exactly what Tagnetics contends it means. In this regard, the Remaining Petitioning Creditors showed no confusion or uncertainty about the scope of the release applying to Related Parties when they acknowledged, "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement."[8] Moreover, the District Court incorrectly interpreted the words "full" and "no carve outs" too narrowly to reference only the types of claims released and not the parties being

---

[8] The fact that the Remaining Petitioning Creditors later changed their mind about the scope of the release does not lead to the conclusion that the phrase "full mutual releases (no carve outs)" means affiliates and other related parties are not included in the releases.

released.  Indeed, by interpreting both words/phrases as referring only to the types of claims being released, and not the parties, the District Court rendered at least one of those words/phrases superfluous, which is contrary to the rules governing contract interpretation.  Additionally, the District Court disregarded a body of case law that strongly supports Tagnetics' position and, instead, relied on one case from another jurisdiction that, when analyzed properly, does not support the District Court's conclusion.  Thus, the phrase "full mutual releasees (no carve outs)" cannot clearly and unambiguously mean that the releases in the settlement agreement were limited only to Tagnetics and the Remaining Petitioning Creditors and do not include Related Parties.  Rather, the phrase "full mutual releases (no carve outs)" must either be clear and unambiguous in that the release applies to Related Parties or, at the very minimum, the phrase is ambiguous, and the Bankruptcy Court (and, thus, the District Court) should have considered extrinsic evidence when interpreting the meaning of the phrase.  When considering the extrinsic evidence, the evidence overwhelmingly favors the outcome advanced by Tagnetics – that the phrase "full mutual releases (no carve outs)" includes releases of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

Second, in the event the District Court (and, thus, the Bankruptcy Court) correctly determined that the phrase "full mutual releases (no carve outs)" does not include releasees of Related Parties, the District Court (and, thus, the Bankruptcy

Court) erred by finding that the parties had a meeting of the minds on the key terms of the agreement and, thus, erred by finding a valid and enforceable settlement agreement.

## STANDARD OF REVIEW

"In an appeal from a district court's review of a bankruptcy court's decision, [the Court of Appeals] directly and independently reviews the bankruptcy court's decisions." *In re Eagle-Picher Indus., Inc.*, 999 F.2d 969, 972 (6th Cir. 1993) (citing *In re Flo-Lizer, Inc.* 946 F.2d 1237, 1240 (6th Cir. 1991)). This Court "review[s] the bankruptcy court's findings of fact for clear error and the district court's conclusion of law *de novo*." *WesBanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs.),* 106 F.3d 1255, 1259 (6th Cir. 1997) (citing *In re Baker & Getty Fin. Servs., Inc.,* 974 F.2d 712, 717 (6th Cir. 1992)).

## ARGUMENT

I. **THE DISTRICT COURT (AND, THUS, BANKRUPTCY COURT) ERRED BY FINDING THAT THE PHRASE "FULL MUTUAL RELEASES (NO CARVE OUTS)" DOES NOT INCLUDE RELEASES OF RELATED PARTIES**

A. **The District Court Erred by Finding the Phrase "Full Mutual Releases (No Carve Outs)" Clearly and Unambiguously Does Not Include Releases of Related Parties**

1. **Legal Standard for Interpreting a Written Contract**

The primary role of the Court in examining a written instrument is to determine and give effect to the intentions of the parties. *Foster Wheeler Enviresponse, Inc. v.*

*Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.* (quoting *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio 1987)). The Court must give plain language its ordinary meaning unless "manifest absurdity" results or unless some other meaning is clearly evident from the face of the overall contents of the contract. *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978)).

If the contract language is clear and unambiguous, there are no issues of fact to be determined. *Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus, of Ohio*, 474 N.E.2d 271, 272-73 (Ohio 1984)). The language will be enforced as written. *See Ledyard v. Auto Wonders Mut. Ins. Co.*, 739 N.E.2d 1, 3-4 (Ohio Ct. App. 2000). Whether the language of an agreement is ambiguous is a question of law for the Court to decide. *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003). When "there is no dispute as to the terms of the agreement," "[s]ummary enforcement . . . is the only appropriate judicial response, absent proof of fraud or duress." *See RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 650 (6th Cir. 2001). Because the District Court concluded the parties' agreement was clear and unambiguous, this Court applies a *de novo* standard of review to that conclusion. *See WesBanco Bank Barnesville*, 106 F.3d at 1259.

## 2. The District Court Mischaracterized Tagnetics' Position on Whether the Agreement was Clear and Unambiguous

In reaching its conclusion that the phrase "full mutual releases (no carve outs)" clearly and unambiguously "does not include or apply to individuals or entities related to the parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, or personal representatives," the District Court curiously started its analysis by finding that Tagnetics "concede[d]" the term is clear and unambiguous, as if somehow Tagnetics agreed with the Court's analysis. *See* Entry and Order Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A741 42. The District Court mischaracterized Tagnetics' position in this regard, as Tagnetics made no such "concession." As explained herein (and in Tagnetics' appeal briefs to the District Court), Tagnetics contends the phrase "full mutual releases (no carve outs)" clearly and unambiguously *includes* Related Parties, but, if it does not clearly and unambiguously include Related Parties, at a minimum, it cannot mean Related Parties are excluded, in which case the phrase is ambiguous and the Court should consider extrinsic evidence to discern its meaning. Indeed, this is the exact position that Tagnetics took before the District Court. *See* Appellants' Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, Case No. 3:19-cv-363, dated February 27,

2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A442.

> **3.** **The District Court's Interpretation Results in "Manifest Absurdity" When Considering the Remaining Petitioning Creditors Conceded Affiliates are Subject to the Releases**

After mischaracterizing Tagnetics' position as a "concession," the District Court stated its conclusion "does <u>not</u> result in 'manifest absurdity.'" *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A742 (emphasis in original). This conclusion likewise is incorrect and quite ironic considering that the Remaining Petitioning Creditors expressly acknowledged the scope of the release advocated by Tagnetics was correct, particularly with respect to affiliates. In this regard, the Remaining Petitioning Creditors expressly acknowledged that, "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement." *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A30.[9] In other words, if Compass Marketing was an affiliate of Tagnetics, it would be among the parties released (and giving a release). This statement is significant because it clearly demonstrates the Remaining Petitioning Creditors understood and agreed

_____

[9] Whether Compass Marketing is an affiliate of Tagnetics is not the point of this statement (and that issue is not before the Court).

that affiliates of Tagnetics were among the parties being released, even though the word "affiliate" does not appear in the phrase "full mutual releases (no carve outs)." The District Court came to the opposite conclusion, however, and dismissed the significance of this acknowledgement by simply stating without any explanation or analysis that it did "not find the [Remaining] Petitioning Creditors' statement to be a concession regarding the scope of the phrase '[f]ull mutual releases (no carve outs).'" *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A746. If this statement was not a concession about the scope of the release, what was it? Indeed, one must ask him/herself why would the Remaining Petitioning Creditors acknowledge affiliates of Tagnetics would be subject to the release if the term "full mutual releases (no carve outs)" clearly and unambiguously does not include affiliates and other Related Parties.

The District Court then proceeded to note that it would not consider the statement anyway because it could not consider extrinsic evidence. *Id.* The Remaining Petitioning Creditors' statement does not constitute extrinsic evidence, however, as extrinsic evidence goes to the parties' intent; this statement shows that the parties agreed on and were reaffirming the meaning of the words at issue and that there was no dispute as to the meaning of those words. *See PNC Bank, N.A. v.*

*Springboro Med. Arts., Inc.*, 2015-Ohio-3386, ¶ 30 (2d Dist. Ct. Appeal 2015) ("If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contract, in determining the parties' *intent*.") (emphasis added) (internal citations omitted); *see also RE/MAX Int'l*, 271 F.3d at 650 (stating *when "there is no dispute as to the terms of the agreement*," "[s]ummary enforcement . . . is the only appropriate judicial response, absent proof of fraud or duress") (emphasis added).[10]   Even if the statement does constitute extrinsic evidence, knowing such a concession was made leads to the unavoidable conclusion that the District Court's interpretation of the phrase "full mutual releases (no carve outs)" does result in "manifest absurdity."

### 4. The District Court Interpreted the Words "Full" and "No Carve Outs" Incorrectly

The District Court also interpreted the phrase "full mutual releases (no carve outs)" by analyzing the meaning of the words "mutual," "full," and "no carve outs." *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A741.  The District Court's analysis of "full" and

---

[10] As noted *infra*, extrinsic evidence may include acts by parties that demonstrate the construction they gave to the agreement.  It is difficult to reconcile that interpretation of extrinsic evidence with the statement of law in *RE/MAX Int'l*, unless (1) an admission of agreement on the meaning of a term is not considered extrinsic evidence or (2) acts by parties that demonstrate their construction of the agreement only concern acts showing contrary interpretations.

"no carve outs" is incomplete and incorrect, however. In this regard, the District Court found that the words "full" and "no carve outs" "are used to clarify that there are no exceptions to the 'mutual releases.'" *Id.* From this statement, it appears the District Court concluded the words "full" and "no carve outs" only describe the types of claims that are subject to the "mutual releases," not the identity of the parties subject to the releases. There is no factual or legal basis to apply such a limited interpretation to these words, however. Moreover, by finding that both "full" and "no carve outs" do not concern the identity of the parties released, but only the types of claims released, the District Court treated the words "full" and "no carve outs" as redundant, which in turn makes at least one of those terms superfluous. Such an outcome violates well established rules of contract interpretation. *See, e.g.*, *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) ("[C]ourts must avoid interpreting contracts to contain superfluous words. The canon is one among many tools for dealing with ambiguity, not a tool for *creating* ambiguity in the first place. 'Where there are two ways to read the text'--and the one that avoids surplusage makes the text ambiguous—'applying the rule against surplusage is, absent other indications, inappropriate.'") (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004)); *see also Gotham v. Basement Care, Inc.*, 2019-Ohio-3872, ¶ 10 (September 25, 2019) (noting the Ohio Supreme Court has instructed that "courts should not interpret contracts in a way that 'render[s] at least one clause superfluous

or meaningless'") (citing *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d 193, 2014-Ohio-3095, ¶ 26 (2014)). Indeed, to avoid such redundancy, the more appropriate conclusion would have been to find that at least one of those words/phrases concerned the parties being released and the other concerned the types of claims being released. As a result, the District Court's misinterpretation and misapplication of these words constitutes error, and it undercuts the District Court's conclusion that the phrase "full mutual releases (no carve outs)" clearly and unambiguously does not include Related Parties.[11]

### 5. The District Court Disregarded Numerous Cases that Undercut its Decision and that Support Tagnetics' Position

The District Court's error regarding its narrow reading of the words "full" and "no carve outs" is further illustrated by case law Tagnetics cited that the District Court disregarded. In this regard, Tagnetics cited numerous cases that found it is "typical" and "standard in release language" to include Related Parties, such as

---

[11] In a single sentence, the District Court also concluded that, if the parties had intended to include Related Parties in the release, "they could have easily so stated that intent in the July 26 email exchanges. *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A742. The District Court's opinion appears to treat this omission as dispositive, but it is not dispositive for the reasons discussed herein. *See Trebilcock v. Elinsky*, 2007 WL 295440, 2007 U.S. Dist. LEXIS 6167, *26 (N.D. Ohio January 26, 2007) (holding that a term sheet is an enforceable agreement even though it did not specifically address and resolve a dispute between the parties as to how the entity in question, Sagebrush, would be managed).

parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.[12]  Because it is "typical" and "standard" to include such parties in a release, a "full" release with "no carve outs" would necessarily, or at least presumably, include a release of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives. Otherwise, "full" and/or "no carve outs" would be written out of the agreement, which is contrary to the rules of contract interpretation.  *See, e.g.*, *TMW Enters.* 619 F.3d at 578; *see also Gotham v. Basement Care, Inc.*, 2019-Ohio-3872 at ¶ 10.  The District Court, however, disregarded the cases Tagnetics cited by "distinguishing" only two of the eight cases cited, and those "distinctions" were ineffective and inaccurate.

One of the cases the District Court took issue with was *Over & Under Piping Contrs. Inc. v. Vt. Gas Sys.*, Case No. 2:15-cv-169, 2019 U.S. Dist. LEXIS 807 (D. Vt. Jan. 2, 2019).  *Over & Under*, however, is highly analogous to the instant case and strongly supports the outcome advocated by Tagnetics.  In *Over & Under*, the parties reached an oral settlement agreement that would include mutual general releases.  *Id.* at *2.[13]  In a subsequent discussion, the parties agreed that the releases

---

[12] Neither Tagnetics nor the District Court found any authority in Ohio or the Sixth Circuit that has addressed the issue before this Court regarding the scope of releases.

[13] The District Court's primary distinction with *Over & Under* was the fact that it involved an oral agreement, but that is immaterial to the issues before the Court.

would be broad.  *Id.* at \*2-3.  Only later, after the draft written agreement was circulated, one of the parties tried to remove "subsidiaries," parent companies," "agents" and other related parties from the list of parties released.  *Id.* at \*5.  The court conducted an evidentiary hearing, where attorneys from both sides testified that a "standard general release for corporate entities . . . in their experience . . . always include[s] the release of employees and agents."  *Id.* at \*5-6.  The court ultimately held that counsel's "subsequent efforts to narrow the scope of the releases to exclude corporate agents were in breach of their initial agreement."  *Id.* at \*11.[14]

The District Court's effort to distinguish *Board of Trs. of Fla. Atl. Univ. v. Bowman*, 85 So. 2d 507 (Fla. Ct. App. 2003), also misses the mark.  While the District Court is correct that the court in *Bowman* was evaluating a motion for attorneys' fees, the court in *Bowman* was still called upon to analyze the scope of a release.  *Id.* at 507-09.  When analyzing the scope of the release, the court in *Bowman* commented in dicta while citing to another case,[15] that it was "typical" when releasing claims against a defendant that the party giving the release also would release the defendant's "agents, employees, and servants."  *Id.* at 509.  The court also found later in its opinion that "[t]he inclusion of agents, employees, etc. is

---

[14] It appears from the court's description of the case the parties on their own narrowed the scope of the dispute to the inclusion of agents and employees.  *Id.* at \*5.

[15] *See id.* at 509 (citing *Hold v. Manzini*, 736 So. 2d 138, 141 (Fla. 3d DCA 1999)).

simply standard language in a general release that should be considered unambiguous." *Id.* at 510. The fact that the court's comment and subsequent finding in *Bowman* was made in the context of a motion for attorneys' fees does not undermine or otherwise diminish the significance of the point that it is "simply standard language in a general release" to include related parties such as "agents, employees, etc." That is the proposition for which *Bowman* was cited and it supports, rather than undermines, Tagnetics' position.

While "distinguishing" only these two cases, the District Court disregarded several other cases Tagnetics cited that all support the proposition that it is "typical" and "standard practice" to include releases of Related Parties when releasing a corporate entity. For example, in *Michele K. Feinzig, P.A. v. Deehl & Carlson, P.A.*, 176 So. 3d 305 (Fla. Ct. App. 2015), the parties entered into a settlement agreement that included mutual releases, but one of the parties objected when the written agreement included the names of specific individuals being released. *Id.* at 309. The court in *Michele K. Feinzig* found that the "mutual releases call[] for the law firms – the actual parties to the lawsuit . . . – to release each other." *Id.* The court then explained that, "*[a]s is standard in release language, each law firm's release includes claims 'on behalf of itself and its respective officers, directors, agents, employees, stockholders, subsidiary corporations, parent corporations, affiliates, underwriters, successors, and assigns*." *Id.* at 309-10 (emphasis added). The court

further found the fact that the mutual releases specifically identified individuals who were employees or stockholders of the respective parties "*in no way* creates an ambiguity, *broadens the scope of the mutual releases*, or contradicts to whom the proposals are being made." *Id.* at 310 (emphasis added). Likewise, in *Alamo Fin., L.P. v. Mazoff*, 112 So. 3d 626, 627, 631 (Fla. 4th DCA 2013), the court "h[e]ld that the language in the general release providing that the plaintiff would release the 'parent corporations, subsidiaries, officers, directors, and employees' of Alamo Financing was unambiguous *standard release language*." (emphasis added).

A number of other court decisions have reached the same or very similar conclusions. *See also, e.g.*, *Obregon v. Rosana Corp.*, 232 So. 3d 1100, 1105 (Fla. 4th DCA 2017) (holding that inclusion of "legal representatives" in a general release was "typical" and including "legal representatives" among the releasing parties "did not render the . . . settlement unenforceable"); *Carey-All Transp., Inc. v. Newby*, 989 So. 2d 1201, 1204-05 (Fla. 2d DCA 2008) (commenting that language in a general release that includes predecessors, successors, agents, servants, and employees among the releasees was not too broad and was "typical of the language contained in many general releases"); *Banta Props. v. Arch Specialty Ins. Co.*, Case No. 10-61485, 2014 U.S. Dist. LEXIS 192154, *7 (S.D. Fla. June 27, 2014) (citing *State Farm Mut. Auto. Ins. V. Nichols*, 932 So. 2d 1067, 1079 (Fla. 2006)) (holding that a settlement calling for a release of Arch, but the actual written release called for a

release of Arch's parent corporations, subsidiaries, affiliates, insureds, agents, employees, and other related parties did not render the offer unenforceable because "general releases have [traditionally] included [such] expansive language designed to protect the offeror from unforeseen developments or creative maneuvering by the other party"); *Arnoul v. Busch Entm't Corp.*, Case No. 8:07-cv-1490-T-24-MAP, 2008 U.S. Dist. LEXIS 104709, *8 (M.D. Fla. Dec. 19, 2008) (holding that a release that included a release of "businesses or other entities affiliated, associated, related, owned, or operated by or with Busch Gardens Entertainment Corporation" was not ambiguous and did not render the offer unenforceable because "[w]ords such as 'associated' constitute 'standard' language 'sufficiently clear and unambiguous' to constitute a reasonable good-faith release").

Instead of relying on or even giving consideration to most of the cases cited by Tagnetics, the District Court relied on a lone federal case from Illinois that is inapposite in numerous respects. In *NRRM, LLC v. Mepco Fin. Corp.*, No. 10 C 4642, 2015 U.S. Dist. LEXIS 39058, 2015 WL 1501897 (N.D. Ill. Mar. 27, 2015), the plaintiff (NRRM) sued the defendant (Mepco) for breach of contract. *Id.* at *5. The defendant (Mepco) in turn filed a counterclaim and a third-party claim against a separate company (Choice) for breach of warranties. *Id.* The third-party defendant (Choice) in turn filed a cross-claim against the plaintiff (NRRM), which in turn filed a counter-cross-claim against the third-party defendant (Choice). *Id.* at *5-6.

NRRM and Mepco eventually reached a settlement, which was reflected in a term sheet (similar to the one at issue in this case), where the parties agreed to "mutual releases" that would be subject to a formal written agreement with customary terms. *Id.* at \*6. Mepco later filed a motion to enforce settlement agreement, which NRRM opposed on the grounds that the settlement was contingent on Choice dropping its claims against NRRM. *Id.* at \*18. The court granted the motion for numerous reasons, including principally because the term "mutual releases" referred only to Mepco and NRRM, not Choice. *Id.* at \*20-25.

The court's decision in *NRRM* is inapposite because the party that NRRM tried to include in the release (Choice) was an unrelated, independent, third party that was separately represented by counsel in the very litigation that led to the settlement and pursuing its own claims against each of the settling parties. Notably, at no point in *NRRM* did the court explore whether Choice should be included in the release as a related party, such as a parent company, subsidiary, or affiliate. The court in *NRRM* referred to Choice as a "third party" and, when summarizing one of NRRM's arguments, it acknowledged that there were three parties in the lawsuit. *Id.* at \*22. In fact, the court noted that NRRM was seeking an interpretation that was not "typical" because, according to NRRM, there was "a complex and at times complicated interrelationship between three parties, each one of whom has sued and been sued by the others." *Id.* These facts are substantially different than the facts in

the present case and, as a result, there was no reason in *NRRM* to expect "standard" or "typical" release language concerning Related Parties would have been involved or relevant to the issues before the court. For these reasons, *NRRM* does not provide any guidance or authority for the instant case, as the facts are substantially and materially different and the legal issue before this Court was not addressed in *NRRM*.

Even if the Court were to rely on *NRRM*, it would bolster Tagnetics' position, not hurt it. In this regard, the court in *NRRM* found that the term "mutual releases" applied only to the two parties that reached a settlement, not the unrelated, separately represented third party. The District Court, however, interpreted the phrases "full mutual releases" and "mutual releases (no carve outs)" to mean the same things as "mutual releases" (the phrase at issue in *NRRM*). This cannot be correct because, to give all three phrases the same exact meaning would make the words "full" and "no carve outs" meaningless and superfluous. As a result, the District Court's reliance on *NRRM* further supports the notion that the District Court erred in its conclusion by applying an improperly narrow definition to the phrase "full mutual releases (no carve outs)."

For these reasons, the District Court erred by finding that the phrase "full mutual releases (no carve outs)" clearly and unambiguously did not include a release of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives. Because the phrase "full mutual

releases (no carve outs)" does not clearly and unambiguously exclude releases of Related Parties, the phrase "full mutual releases (no carve outs)" must either (a) clearly and unambiguously include releases of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives, or (b) it is ambiguous, in which case the District Court erred by not relying on the abundance of extrinsic evidence to find that the parties intended to and did in fact agree to release Related Parties.

**B.    IF "FULL MUTUAL RELEASES (NO CARVE OUTS)" DOES NOT CLEARLY AND UNAMBIGUOUSLY INCLUDE A RELEASE OF RELATED PARTIES, THE DISTRICT COURT SHOULD HAVE FOUND THE PHRASE WAS AMBIGUOUS AND, THEREFORE, IT SHOULD HAVE CONSIDERED EXTRINSIC EVIDENCE, WHICH OVERWHELMINGLY SUPPORTS TAGNETICS' INTERPRETATION**

For the reasons discussed above in Section I.A, the Court should not only find that the phrase "full mutual releases (no carve outs)" does not clearly and unambiguously exclude releases of Related Parties, it also should find that the phrase clearly and unambiguously includes releases of Related Parties. If the Court concludes that the phrase does not clearly and unambiguously include releases of Related Parties, then the phrase is ambiguous and extrinsic evidence should be considered to discern the phrase's meaning.[16]

---

[16] Although the District Court concluded the phrase "full mutual releases (no carve outs)" was clear and unambiguous and, thus, it did not need to analyze extrinsic evidence, it conducted a cursory review of the extrinsic evidence put forth by

## 1.    Standard for Determining Ambiguity

Whether the language of an agreement is ambiguous is a question of law for the Court to decide.  *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003). The primary role of a court in examining a written instrument is to determine and give effect to the intentions of the parties.  *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361 (Ohio 1997). Terms of a contract are ambiguous "where the language of a contract is reasonably susceptible [to] more than one interpretation." *Geczi v. Lifetime Fitness*, 2012-Ohio-2948, 973 N.E.2d 801, 806 (Ohio Ct. App. 2012).  A court may consider extrinsic evidence to ascertain the parties' intent when a term of a contract is ambiguous.  *Lutz v. Chesapeake Appalachia, LLC*, 148 Ohio St. 3d 524, 2016- Ohio 7549, 71 N.E.3d 1010, 1013 (Ohio 2016).  The court may consider extrinsic evidence, such as: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Id.* (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App. 3d 45, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)).  Trade usage of certain terms has been found to be extrinsic evidence admissible for the purpose

---

Tagnetics. *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A745 - 47; *see also Id.* at A742 – 44.

of showing the parties to an agreement "employed terms having a special meaning within a . . . particular trade or industry, not reflected on the face of the agreement." *Kenney v. Chesapeake Appalachia, LLC*, 2015-Ohio-1278, 31 N.E.3d 136, 147 (Ohio Ct. App. 2015) (quoting *Alexander,* 53 Ohio St. 2d at 248).

### 2. The Phrase "Full Mutual Releases (No Carve Outs)" Is Ambiguous

The arguments set forth above in Section I.A support the conclusion that the phrase "full mutual releases (no carve outs)" is at a minimum ambiguous if it does not clearly and unambiguously include releases of Related Parties. Rather than repeat those arguments here, they are incorporated by reference, with some added explanations below as to why the phrase is rendered ambiguous and requires the use of extrinsic evidence.

As discussed above in Section I.A.4, the District Court determined that "full" and "no carve outs" only concerned the types of claims released, not the parties subject to the releases. The District Court, however, did not explain why it applied the same meaning to both phrases/words or why it assumed the words only concerned the types of claims released. To avoid rendering the terms "full" and "no carve outs" redundant and superfluous, some other meaning must be applied to at least one of those words/phrases. Tagnetics has offered a viable and rationale alternative and, when courts are presented with two equally plausible interpretations of a word or phrase, it is appropriate to consider extrinsic evidence to discern the

word's or phrase's meaning. *See Fletcher v. Honeywell Int'l, Inc.,* 892 F.3d 217, 221 (6th Cir. 2018) ("If, however, the plain language [found in a contract] is susceptible to more than one interpretation, [the court] then consider[s] extrinsic evidence to supplement the parties' intent.") (quoting *Moore v. Menasha Corp.,* 690 F.3d 444, 451 (6th Cir. 2012)); *see also Oryann, Ltd. v. SL & MB, LLC,* 2015-Ohio-5461, ¶ 26, (Ohio Ct. App. 2015) (stating a court may consider extrinsic evidence to interpret terms of a contract if the terms are ambiguous, i.e., "if the terms are reasonably susceptible to more than one interpretation"). Indeed, a number of cases cited by Tagnetics in Section I.A.5 demonstrate the interpretation offered by Tagnetics is not some abstract hypothetical, and it is "typical" and "standard." Plus, there is no basis for the District Court's assumption that the phrases "full" and "no carve outs" only concern the types of claims released and not the parties being released.

In addition, cases cited by Tagnetics that hold it is "typical" and "standard" to include Related Parties in releases relied on extrinsic evidence to reach those conclusions. For example, in *Over & Under*, in concluding that the parties intended to release not only the corporate named entities, but their agents and employees as well, the court relied on witness testimony that showed it is "standard language" in such releases to include related parties such as employees and agents of a released corporate entity. *Over & Under*, 2019 U.S. Dist. LEXIS 807 at *11. Indeed, the

witness testimony confirmed that it was customary when negotiating a release for a corporate entity to also release the agents and employees. *Id.* at *5-6, 11.

For these reasons, if "full mutual releases (no carve outs)" does not clearly and unambiguously include releases of Related Parties, at a minimum, it is ambiguous and requires the consideration of extrinsic evidence to discern its meaning.

### 3. Extrinsic Evidence Overwhelmingly Favors Finding That "Full Mutual Releases (No Carve Outs)" Includes Releases of Related Parties

Just as the court in *Over & Under* considered testimony from the parties' counsel, the Bankruptcy Court heard testimony from Tagnetics' counsel (and the Remaining Petitioning Creditors). In this case, Tagnetics put forth unrebutted testimony by an attorney who has been practicing for more than twenty years who stated it was "standard operating procedure" to include Related Parties in a release, releasing affiliates of a company was common in these types of agreements, and he could not recall a single instance during the course of his career where a release of a corporate entity did not also include a release of related individuals/entities. *See* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A198.

The District Court dismissed the significance of this unrebutted testimony by finding that Tagnetics had to establish the words at issue had "special meaning within a certain geographic location or a particular trade or industry." *See* Entry and

Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A744. The District Court then proceeded to conclude that Tagnetics' citation to two cases (it was actually eight) from other jurisdictions was not sufficient to "evince a custom or usage so widespread" to support the conclusion that use of the phrase "full mutual releases (no carve outs)" was intended to have a more expansive meaning. *Id.*[17] The District Court also discounted Tagnetics' counsel's testimony (calling it "arguably self-serving"), which is directly contradicted by the Bankruptcy Court, which expressly found that Tagnetics' counsel provided credible testimony. *See* Transcript of Bankruptcy Court's Oral Opinion, dated October 25, 2019 (RE 141, Case 3:19-bk-30822), RE A382, Page ID # A384. Furthermore, the District Court's reliance on *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St. 2d 241 (Ohio 1978), is misplaced because the court in *Alexander* simply found that reliance on an affidavit was insufficient to establish a general custom or trade usage regarding use of the terms "oil" and "gas" in 1911. Here, counsel's unrebutted testimony is buttressed by at least eight court decisions and no

---

[17] The fact that the Remaining Petitioning Creditors are proceeding pro se should not excuse any potential lack of familiarity with these norms, particularly in this case where they were urged on multiple occasions to seek their own counsel. *See* Email from Jon Hager to Stephen Stern, dated July 26, 2019, RE A12, Page ID # A13 – 14, A15 – 16, A17 – 18; Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A29; *see also* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A179 - 80, A187 - 88, A260 - 61, A315.

contrary decisions. At bottom, it was improper for the District Court to not assign the proper weight to the unrebutted testimony offered by Tagnetics. *See, e.g., Washkeweicz v. Seredick*, 1986 Ohio App. LEXIS 5216, *17 (8th Dist. 1986) (explaining that, in the context of whether an individual had the capacity to enter into an agreement, "[t]he trial court's complete disregard of now admissible, unimpeached, unrebutted testimony" was "against the manifest weight of the evidence and constitutes an abuse of discretion and reversible error").

The extrinsic evidence proffered by Tagnetics was not limited to the unrebutted testimony of Tagnetics' counsel and case law, however. For example, Tagnetics also presented a previously executed settlement agreement between Tagnetics and Kayser Ventures, Ltd., to further bolster its argument that the Remaining Petitioning Creditors knew (or should have known) that the scope of the release intended to include Related Parties. *See* Settlement and Mutual General Release Agreement, fully executed on July 17, 2019, RE A31, Page ID # A32; *see also* Appellant's Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, case No. 3:19-cv-363, dated February 27, 2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A437 – 38. The District Court dismissed this evidence because it was an agreement with "none of the [Remaining] Petitioning Creditors." *See* Entry and Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case,

dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A745. This is simply not true, as Tagnetics explained this earlier settlement agreement involved Kayser Ventures, Ltd., an entity that was owned by Kayser (one of the Remaining Petitioning Creditors), and he was the individual that signed the agreement on behalf of Kayser Ventures, Ltd. *See* Appellant's Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, case No. 3:19-cv-363, dated February 27, 2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A438; Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A185, 198; Settlement and Mutual General Release Agreement, fully executed on July 17, 2019, RE A31, Page ID # A32. Thus, this prior settlement agreement showed what Tagnetics expected and what the individual leading the Remaining Petitioning Creditors expected in terms of a release.

The District Court also dismissed, or actually misapprehended, the significance of the release the Remaining Petitioning Creditors required from Tagnetics. *See* Entry and Order Affirming the Bankruptcy Court's October 26, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A746 - 47. Tagnetics explained the Remaining Petitioning Creditors sought "full mutual releases (no carve outs)" because they were concerned about exposure from other agreements and they were

adamant that they needed full releases. *See* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A186 – 87; 226 - 27; *see also* Appellant's Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, case No. 3:19-cv-363, dated February 27, 2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A439 - 40. Indeed, if the Remaining Petitioning Creditors insisted on full mutual releases, it would make no sense that Tagnetics would receive anything less, which would be the case if its release did not include a release of Related Parties. The District Court dismissed this evidence because it did not have to consider "subjective intent" and the allegations were "unsupported." *See* Entry and Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A746. This conclusion simply ignores the unrebutted evidence of the Remaining Petitioning Creditors' insistence on full mutual releases. *See* Hearing Transcript, held on October 18, 2019, RE A155, Page ID # A186 – 87, 226 – 27; *see also* Appellant's Brief in Tagnetics, Inc. v. Kenneth Kayser, et al., United States District Court for the Southern District of Ohio, case No. 3:19-cv-363, dated February 27, 2020 (RE 12, Case No. 3:19-cv-363, Page ID # 466 – 503), RE A414, Page ID # A439 - 40.[18]

---

[18] The District Court also somehow misconstrued Tagnetics' references to the draft settlement, suggesting Tagnetics "wishes" it were the actual agreement. *See* Entry and Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating

Furthermore, the Remaining Petitioning Creditors did not object to the releases they were receiving from Tagnetics' parents companies, subsidiaries, affiliates, officers, directors, and other Related Parties when they received the draft settlement agreement. *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A29 - 30.

Furthermore, to the extent the August 19, 2019 email where the Remaining Petitioning Creditors expressly acknowledged that, "[i]f Compass [Marketing] is not an operating affiliate [sic] then they are not party to this settlement" does constitute extrinsic evidence, that email represents compelling evidence that supports Tagnetics' argument regarding the meaning and intent of the phrase "full mutual releases (no carve outs)." In this email, the Remaining Petitioning Creditors acknowledged that Compass Marketing would be subject to the release if it was an affiliate of Tagnetics, even though the word "affiliate" appears nowhere in the July 26 emails. Consideration of this email alone precludes any conclusion other than the one advanced by Tagnetics – that the phrase "full mutual releases (no carve outs)" was understood by all the parties to mean a release of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

---

Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A743. Tagnetics simply contended that the draft agreement was consistent with and reflected the terms of the parties' actual agreement.

Lastly, it should be noted that there is no contrary extrinsic evidence to support any outcome other than the one advocated by Tagnetics.

For these reasons, when considering the extrinsic evidence (whether individually, and certainly cumulatively), the only reasonable conclusion that a court can reach is that the parties intended and expected the phrase "full mutual releases (no carve outs)" to include a release of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives.

## II. ALTERNATIVELY, IF "FULL MUTUAL RELEASES (NO CARVE OUTS)" DOES NOT INCLUDE A RELEASE OF RELATED PARTIES, THE DISTRICT COURT SHOULD HAVE FOUND THAT THERE WAS NO MEETING OF THE MINDS AND THERE IS NO VALID SETTLEMENT AGREEMENT TO ENFORCE

If the District Court correctly determined that "full mutual releases (no carve outs)" did not include releases of Related Parties, the District Court erred by finding that there was a meeting of the minds and there was a settlement agreement to enforce.

Like any other contract, an enforceable settlement agreement requires "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976)). "A meeting of the minds as to the essential terms of the contract is a requirement to

enforcing the contract." *Id.* "In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." *Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, ¶ 18 (Ohio Ct. App. 2018). While Ohio law does not require the parties share a subjective meeting of the minds, it does require the terms of the agreement establish an objective meeting of the minds, meaning the contract was clear an unambiguous. *See 216 Jamaica Ave., LLC v. S&R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008). Courts consider "only objective manifestations of intent," and "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed." *Nilavar v. Osborn*, 711 N.E.2d 726, 732, 127 Ohio App. 3d 1 (Ohio Ct. App. 1998). "Once there is such a meeting of the minds, one cannot refuse to proceed with settlement due to a mere change of mind." *Turoczy Bonding Co.*, 2018-Ohio-3173 at ¶18.

As discussed above, if the District Court (and Bankruptcy Court) incorrectly determined that "full mutual releases (no carve outs)" clearly and unambiguously excluded Related Parties, and that term does not clearly and unambiguously include Related Parties, there is ample extrinsic evidence to show Tagnetics expected the broader releases (i.e., those including Related Parties) to apply, as reflected in the draft settlement agreement. For example:

- Tagnetics included the same exact release language in an earlier agreement in the very same case, which was signed by Kayser in his capacity as the owner of Kayser Ventures, Ltd. *See*

Settlement and Mutual General Release Agreement, fully executed on July 17, 2019, RE A31, Page ID # A32.

- Kayser made no argument at that time that a full release does not (or should not) include Tagnetics' related individuals/entities. Only after receiving the draft settlement agreement did Kayser and the other Remaining Petitioning Creditors object to the scope of the release. *See* Email from Stephen Stern to Jon Hager, dated August 19, 2019, RE A29, Page ID # A29 – 30.

- The release given by Tagnetics to the Remaining Petitioning Creditors included not only Tagnetics, but "its current and former parent companies, corporate and operating affiliates, subsidiaries, and related entities, as well as each of their current and former directors, officers, shareholders or other equity holders, agents, employees, accountants, attorneys, and insurers . . . ." The Remaining Petitioning Creditors, however, make no argument that their understanding of the settlement terms did not include a release by Tagnetics and its related individuals/entities of the Remaining Petitioning Creditors. *See Id.*

- The Remaining Petitioning Creditors conceded that they understood the term "full mutual releases (no carve outs)" to include a release of Related Parties. *See Id.*

- Tagnetics' offer to release the Remaining Petitioning Creditors of claims not only by Tagnetics, but also its related individuals/entities, provides clear and substantial evidence that Tagnetics objectively (and subjectively) understood the scope of the release applied to the parties to the litigation and their respective related individuals/entities. *See* Email from Stephen Stern to Ken Kayser, Ronald Earley dated August 14, 2019 with attached Settlement Agreement, RE A21, Page ID # A21 – 28.

*See Trs. of the Painters, Union Deposit Fund v. G&T Commer. Coatings, Inc.*, Civil Action No. 13-CV-13261, 2014 U.S. Dist. LEXIS 129945, *25-26 (E.D. Mich. Sept. 17, 2014) (explaining that, when determining the intent of the language of the

contract, a court may look to "other indicia of intent, such as the 'bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning'") (quoting *Int'l Bhd. of Elec. Workers v. N.L.R.B.*, 788 F.2d 1412, 1414 (9th Cir. 1986)).

Based on the prior history and the settlement negotiations, including objective and subjective evidence of Tagnetics' understanding based on the scope of the release it offered to the Remaining Petitioning Creditors and it sought in return, as well as the customary usage of the phrase "full mutual releases (no carveouts)," and the Remaining Petitioning Creditors' acknowledgement that the release applied to Related Parties (including specifically affiliates), there can be no meeting of the minds between Tagnetics and the Remaining Petitioning Creditors if the phrase "full mutual releases (no carve outs)" is found to exclude the parties' related individuals/entities, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives. *See Beechwood Villa Apartments v. Nord Bitumi U.S., Inc.,* 1990 Ohio App. LEXIS 1561 (12th Dist. 1990) (finding that no "meeting of the minds" occurred when the litigants had differing views as to the scope of the release in exchange for the settlement funds). In addition, there was no meeting of the minds because it is evident that the list of released (and releasing) parties was not identified with sufficient particularity. *See Wilson v. Pride,* 2019-Ohio-3513, ¶ 41 (8th Dist.2019) (refusing to enforce a settlement agreement when,

based on the parties' testimony and court record, the "terms of the alleged agreement were not stated with sufficient particularity" and, thus, there was no meeting of the minds).

The District Court takes issue with *Beechwood Villa Apartments* given that the settlement agreement, which subsequently was put into writing, was made orally, rather than, as in in this case, via email. *See* Entry and Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A750. Whether the alleged agreement occurred orally (versus an email exchange, as is the case here) is essentially a distinction without a difference, as Ohio courts have held that oral contracts are as enforceable as the purported key terms emails that form the basis for the instant settlement agreement. *See, e.g., Advantage Renovations, Inc. v. Maui Sands Resort, Co., LLC,* 2012-Ohio-1866, ¶18 (6th Dist. 2012) (recognizing that an oral agreement is enforceable, so long as the terms of the agreement are sufficient particular, which may be determined from the actions of the parties). Further, the District Court correctly explained that the trial court in *Beechwood Villa Apartments* relied upon an affidavit of one of the attorneys, but it concluded the affidavit was unclear concerning one key term,[19] which seems to support Tagnetics'

---

[19] *See* Entry and Affirming the Bankruptcy Court's October 25, 2019 Order and Terminating Case, dated April 27, 2020 (RE 16, Case No. 3:19-cv-363, Page ID # 797 – 816), RE A732, Page ID # A750.

point rather than undermine it. *Beechwood Villa Apartments*, 1990 Ohio App. LEXIS 1561 at *4. Here, Tagnetics counsel presented live testimony under oath concerning what Tagnetics believed was the scope of the releases being exchanged. Based on the factual record in *Beechwood Villa Apartments*, the court ultimately concluded that it was "convinced that the completely opposite views of the parties indicate that there was no meeting of the minds regarding the scope of the settlement agreement. Accordingly, there is no 'contract' with respect to the settlement agreement and the trial court erred in ordering its enforcement." *Id.* at *5. Likewise, following the exchange of the July 26, 2019 emails, *all* subsequent actions regarding the settlement agreement, other than the August 16, 2019 email from the Remaining Petitioning Creditors, demonstrated that the parties "had opposite views" and, therefore, there was no meeting of the minds.

Tagnetics argued at the District Court that a court may not reform a contract unless it finds a mutual mistake. *See Bank of Am., N.A. v. Seymour,* 2019-Ohio-2884, ¶ 20 (10th Dist. 2019) (holding that a court may reform a contract "when, due to a mutual mistake of the parties, the contract does not evince the actual agreement entered into between the parties"). Even if a mutual mistake is found, however, reformation is not required, as recission is the appropriate remedy. *See Reilley v. Richards*, 69 Ohio St. 3d 352, 352-53 (Ohio 1994) ("This court recognizes the doctrine of mutual mistake as a ground for the recission of a contract under certain

circumstances."). As Tagnetics argued before the District Court, the Bankruptcy Court reformed the settlement agreement to include terms to which Tagnetics did not agree. As a result, the District Court (and the Bankruptcy Court) should have rescinded the settlement agreement or otherwise found it unenforceable. Instead, the Bankruptcy Court read the settlement terms as narrowly as possible, finding that the agreed upon terms included only a release of Tagnetics and the Remaining Petitioning Creditors (not the Related Parties). Objectively, Tagnetics' understanding of the settlement terms was fundamentally different than Remaining Petitioning Creditors on a material term to the agreement and, therefore, the Bankruptcy Court should not have enforced the agreement *in toto*, as there was no manifestation of assent and/or meeting of the minds.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the District Court (and, thus, the Bankruptcy Court) and hold either (1) the term "full mutual releases (no carve outs)" included releases of Related Parties, such as parent companies, subsidiaries, affiliates, officers, directors, heirs, and personal representatives, or (2) if the term "full mutual releases (no carve outs)" is not given the meaning advocated by Tagnetics, there was no meeting of the minds and, thus, there was no settlement agreement to enforce.

Dated: July 8, 2020           Respectfully submitted,


           */s/ Stephen B. Stern*
Stephen B. Stern
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(410) 216-7900 – Telephone
(410) 705-0836 – Facsimile
stern@kaganstern.com (email)

*Counsel for Appellant/Alleged Debtor*
*Tagnetics, Inc.*


## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,644, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


                     */s/ Stephen B. Stern*
                    Stephen B. Stern

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2020, a copy of the foregoing Brief of Appellant

was served (i) **electronically** on the date of filing through the Court' s ECF System

on all ECF participants registered in this case at the email address registered with

the court and (ii) by **ordinary U.S. Mail** on July 8, 2020  addressed to:


Kenneth W Kayser
PO Box 115
Catawba, VA 24070

Ronald E. Early
6429 Winding Tree Drive
New Carlisle, OH 45344

Jonathan Hager
842 Paint Bank Road
Salem, VA 24153

MaryAnne Wilsbacher
Office of the United States Trustee
170 North High Street
Suite 200
Columbus, Ohio 43215


*/s/ Stephen B. Stern*
Stephen B. Stern

**ADDENDUM**

Pursuant to 6 Cir. R. 28(b)(1)(A)(i) and 30(g)(1), Appellant Tagnetics, Inc. hereby designates the following electronic filings as relevant district court documents:

| **Description of Item** | **District Court Docket Entry Number** | **Page ID # for Relevant Rage** |
|---|---|---|
| Notice of Appeal from Bankruptcy Court | 1 | A408 - 410 |
| Bankruptcy Court Clerk's Certification of Record – 101 – Motion to Enforce Settlement | 2-12 | A37 - 134 |
| Bankruptcy Court Clerk's Certification of Record – 106 – Response to Motion to Enforce | 2-14 | A135 - 154 |
| Bankruptcy Court Clerk's Certification of Record – 119 – Order | . 2-21 | A405 |
| Appellant's Brief, dated February 27, 2020 | 12 | A414 – 675 |
| Appellant's Brief – Exhibit 1 – Email from Jon Hager to Stephen Stern, dated July 26, 2019 | 12-1 | A12 - 20 |
| Appellant's Brief – Exhibit 2 – Email from Stephen Stern to Ken Kayser and Ronald Earley, dated August 14, 2019 with attached Settlement Agreement | 12-2 | A21 - 28 |
| Appellant's Brief – Exhibit 3 – Email from Stephen Stern to Jon Hager, dated August 19, 2019 | 12-3 | A29 - 30 |
| Appellant's Brief – Exhibit 5 – Hearing Transcript, held on October 18, 2019 | 12-5 | A155 - 342 |

| | | |
|---|---|---|
| Appellant's Brief – Exhibit 6 – Settlement and Mutual General Release Agreement, fully executed on July 17, 2019 | 12-6 | A31 - 36 |
| Appellee's Brief, dated March 12, 2020 | 14 | A676 – 716 |
| Appellant's Reply Brief, dated March 26, 2020 | 15 | A717 – 731 |
| Entry and Order Affirming Bankruptcy Court's October 25, 2019 Order and Terminating Case | 16 | A732 – 751 |
| Notice of Appeal to 6th Circuit Court of Appeals | 17 | A752 - 753 |